89 Cal.App.3d 168 (1979)
152 Cal. Rptr. 327
In re FRED J. et al., Persons Coming Under the Juvenile Court Law.
HARRY BRODY, as Director, etc., Plaintiff and Respondent,
v.
ADDIE M., Defendant and Appellant.
Docket Nos. 17719, 17720.
Court of Appeals of California, Third District.
February 2, 1979.
*172 COUNSEL
Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Gary S. Goodpaster, Chief Assistant State Public Defender, Mark L. Christiansen and James G. Wright, Deputy State Public Defenders, for Defendant and Appellant.
Evelle J. Younger, Attorney General, John J. Klee, Jr., Assistant Attorney General, Thomas E. Warriner and Floyd D. Shimomura, Deputy Attorneys General, for Plaintiff and Respondent.
OPINION
PARAS, J.
On March 18, 1977, Fred J. and Antoinette J., minors, were declared dependent children of the San Joaquin County Juvenile Court under Welfare and Institutions Code section 300, subdivision (a).[1] The minors were permitted to remain in the physical custody of their mother, subject to certain orders of the juvenile court.
On November 9, 1977, the San Joaquin Department of Public Assistance filed separate petitions as to each child, requesting modification of the previous custody disposition. The petitions alleged that placement with the mother had been ineffective to provide for the *173 minors' welfare, which latter required that the minors' placement be removed from the mother.
Pursuant to rule, the court appointed separate attorneys for the mother and for the children. (Cal. Rules of Court, rule 1363(c).) After a hearing the juvenile court ordered that custody of the minors be taken from the mother and placed in the San Joaquin County Department of Public Assistance for ultimate placement in a foster home, group home, or dependent children's facility. From this judgment the mother appeals.

I
The petition alleges that "[y]our petitioner [the department] believes that there has been a change of circumstances which would require a hearing to modify the previous placement of the Court dated March 18, 1977, as provided in Section 388 of the California Welfare and Institutions Code." The mother asserts that inasmuch as the department sought removal of her children, such proceedings had to be pursuant to section 387.
The Welfare and Institutions Code contemplates two procedures for review of previous section 300 disposition determinations. Section 388 provides in pertinent part: "Any parent or other person having an interest in a child who is a dependent child of the juvenile court or the child himself ... may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child ... for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court...." Section 387 provides: "An order changing or modifying a previous order by removing a child from the physical custody of a parent ... and directing placement in a foster home, or commitment to a private institution or commitment to a county institution, shall be made only after noticed hearing upon a supplemental petition." It has been observed that "[t]he wording of sections 775-778 and 385-388 (relating to dependent children) is confusing. Filing by the probation officer of a supplemental petition for modification is required only when an order is sought that would remove the minor from the home of a parent.... Apparently other types of modifications may be made without filing a supplemental petition...." (Italics in original.) (Cal. Juvenile Court Desk Book (Cont.Ed.Bar 1978) § 11.1, p. 220.) The rules have interpreted these sections to permit use of a section 388 petition to modify only when it does not seek a "more restrictive level of physical *174 custody;" where removal of the child from its parents is sought, the rules contemplate a section 387 supplemental petition. (Cal. Rules of Court, rule 1391; and see Advisory Committee com. thereto.) Whether the petition here was brought pursuant to section 387 or section 388 does not constitute a distinction without a difference. (1) It appears that a petition for modification, since it does not contemplate a more restrictive placement, is judged by a preponderance of the evidence standard (see Evid. Code, § 115) whereas a supplemental petition is judged by the same standard as an original proceeding (see In re Arthur N. (1976) 16 Cal.3d 226 [127 Cal. Rptr. 641, 545 P.2d 1345]) which in a section 300 hearing that may result in removal of a child from its parent requires application of the clear and convincing evidence standard. (In re Robert P. (1976) 61 Cal. App.3d 310 [132 Cal. Rptr. 5]; In re Christopher B. (1978) 82 Cal. App.3d 608, 616-618 [147 Cal. Rptr. 390].)
(2) The Attorney General in response notes that "[t]he petitions were ... drafted to comply with both the requirements of Welfare and Institutions Code section 387 (concerning removal of children from parents' physical custody) and Welfare and Institutions Code section 388 (concerning changing or modifying previous order of the juvenile court). Thus, references to both sections may be found in the petitions." We have independently examined the petition. It alleges a change of circumstances pursuant to section 388; however, it also alleges "that the above named minors come within provisions of sections 300a/387 of the Welfare and Institutions Code of the State of California." Accordingly we conclude that though not a model of clarity, the petition as pleaded embraced both a section 387 and 388 proceeding, and thus was valid. The fact that under the circumstances a section 388 petition was inappropriate is of no consequence, since the pleading was to that extent surplusage.

II
(3a) Resolution of the question of the code section under which the petition was brought brings us to the mother's second contention. She asserts that "... the juvenile court apparently applied a standard of preponderance of the evidence...." It is difficult to determine on what basis this "apparent" application of an improper burden of proof is asserted. The record itself is silent on the subject, and we can only conclude that the mother draws this inference from the divergent burdens of proof growing out of the dual aspect of the petition.
*175 The question of need to articulate the standard of proof employed by a trial court has recently been addressed by our Supreme Court. (4) In essence it held that where a new standard of proof recently has been announced, or where the issue of the applicable standard is unclear, articulation is required. (See e.g., People v. Jimenez (1978) 21 Cal.3d 595, 609 [147 Cal. Rptr. 172, 580 P.2d 672]; People v. Jetter (1975) 15 Cal.3d 407 [124 Cal. Rptr. 633, 540 P.2d 1217].) On the other hand, where the issue is well settled, it is presumed that the trial judge applied the appropriate standard and no articulation is required. (Ross v. Superior Court (1977) 19 Cal.3d 899, 914-915 [141 Cal. Rptr. 133, 569 P.2d 727].) (3b) Here the required standard of proof was announced on August 19, 1976 (In re Robert P., supra, 61 Cal. App.3d 310), and the judge's decision in the instant case was rendered April 14, 1978, almost two years later. Under such circumstances we presume application of the proper standard.

III
The mother next objects on the basis that the petition did not give notice of the matters against which she was required to defend and the court failed to make findings. These issues will be separately considered.

A
Section 387, subdivision (a), provides that "[t]he supplemental petition ... shall contain a concise statement of facts sufficient to support the conclusion that the previous disposition has not been effective in the rehabilitation of the minor." (Italics added.)
It has been held specifically that "[n]otice of the allegations upon which the deprivation of custody is predicated is fundamental to due process. [Citations.] Accordingly, a parent must be given notice of the specific factual allegations against him or her with sufficient particularity to permit him or her to properly meet the charge." (Italics added. In re J.T. (1974) 40 Cal. App.3d 633, 639 [115 Cal. Rptr. 553].) We set out in the margin the actual relevant contents of the petition.[2]
*176 At the outset we are confronted with the Attorney General's assertion that the mother's failure to assert any inadequacy of pleadings in the trial court precludes the effort for the first time on appeal. He does not however suggest what procedural device the mother might have used. We note that in In re J.T., supra, the court observed "[t]his petition was demurred to on the grounds that it failed to state facts sufficient to constitute a cause of action against appellant and that it was uncertain, ambiguous and unintelligible. The demurrer was overruled." (In re J.T., supra, at p. 639.) (5) On the other hand we have diligently examined the statute governing section 300 proceedings, the rules, and various pleading and practice texts. Not one expressly recognizes the use of a demurrer in a section 300 hearing.[3] Indeed juvenile court proceedings apparently do not contemplate any written pleadings by parents or children.
As above observed, due process requires that constitutionally adequate notice be given. The apparent absence of a procedural device to raise the question of adequacy creates an awkward hiatus between theory and practice. As we have noted, at least one California case implicitly recognizes the demurrer as proper. It is our judgment that since the constitutional requirement of notice must have as its concomitant a means of testing the adequacy of such notice, the juvenile court has inherent power to entertain a prehearing challenge to the petition's sufficiency by a motion akin to a demurrer. The parties should have an opportunity to test the sufficiency in the trial court, rather than reserving that question for the Court of Appeal.[4]
*177 (6) Although we now declare the availability of such a procedural device in juvenile proceedings, the failure of the mother to utilize it at a time when its availability was at least uncertain does not preclude her from raising the issue here. (Anton v. San Antonio Community Hosp. (1977) 19 Cal.3d 802, 828 [140 Cal. Rptr. 442, 567 P.2d 1162].)
(7) We now consider the merits. The petition includes a mixture of factual allegations, conclusionary descriptions, and conclusionary opinions of the petitioner. Very likely prepared by a lay person,[5] the petition is no model of pleading. It contains too many adjectives which some might argue convert factual matter into opinion (e.g., the mother prevents "meaningful" contact between the placement social worker and the minors, the mother did not obtain "appropriate" mental health counseling, etc.). But our reading of it (see fn. 2, ante), leads us to conclude that it provided meaningful notice to the mother, who cannot credibly argue that it failed adequately to communicate the department's concerns to her. We hold it to be sufficient.

B
The mother rests her assertion of inadequate findings on the requirements of the "demonstration county" provisions of section 361.5; the Attorney General is correct in pointing out that the two demonstration counties are Shasta and San Mateo (see 6 Witkin, Summary of Cal. Law (8th ed.) Parent and Child, § 257A (1978 Supp.) pp. 173-174.) Thus the mother cannot prevail on this ground.
(8) "It has been held in this state that the Juvenile Court Law does not require the making of specific findings, and that a general finding that the allegations of the petition are true is sufficient to show the facts upon which the court exercised its jurisdiction to declare the minor a ward or dependent child of the court. [Citations.] This rule presupposes, however, that the allegations of the petition state appropriate ultimate facts which set forth the specific charge of factual allegations upon which an adjudication is sought...." (In re J.T., supra, 40 Cal. App.3d at p. 640.) As above noted, the factual allegations were sufficient. The trial court found specifically that the "minors come within provisions 387 of the Calif. Welf. & Inst. Code.... [Minors] welfare ... requires that ... custody be taken from their mother.... (9) (See fn. 6.) Award of *178 physical custody to ... mother ... at this time would be detrimental to the welfare of the minors."[6] (10) Such findings were adequate under section 361 and rule 1377(b)(2), California Rules of Court. Although the findings technically are not in literal compliance with the requirements of rule 1392(d)(1)(a),[7] it is obvious that this is nonprejudicial, for rule 1392(d)(1)(a) findings are implicit in the findings actually made.

IV
For reasons that do not appear of record the juvenile court moved immediately from the jurisdictional hearing to disposition and failed to hold a separate, discreet disposition hearing. The mother challenges the trial court proceedings on this ground.
(11) It is clear that even with a supplemental petition under section 387 a bifurcated hearing is required. (Cal. Rules of Court, rule 1392(d)(2); see also Advisory Committee com. to rule 1392.) Therefore this challenge is well taken, and reversal is thereby necessitated.

V
We now turn to various evidentiary issues. During the course of supervision of the children pursuant to the initial section 300 determination, the social worker suggested that the mother take them to the county mental health clinic. She refused, and instead elected to have them examined by two private psychiatrists, Robert Griswold and Bienvenido C. Garcia. At the hearing, the department called the doctors to testify. Overruling privilege objections by the attorneys for both the mother and the children, the court allowed their testimony. Error is claimed.
*179 (12) Initially the Attorney General asserts that the error, if any, was only as against the children; and since they have not appealed, the mother has no standing to raise this issue. We agree. The mother signed three release forms authorizing Dr. Griswold to disclose his information to the public defender's office, the Social Security Administration and/or the state Department of Health, and the state Department of Social Welfare and San Joaquin County Department of Public Assistance. On two occasions, she directed Dr. Garcia to write reports to the Social Security Administration, and to the Lottie Grunsky School, which he did. Thus to the extent that the mother might have had a privilege, which is extremely doubtful (see Evid. Code, §§ 993, 1013), she waived it by disclosure or consent to disclosure (see Evid. Code, § 912).
(13), (14) To the extent that the children had the privilege (Evid. Code, §§ 994, 1014), the issue is academic here, because they did not appeal. "Errors that affect only the appellant's coparties who are not in privity with him and do not appeal will ordinarily not be reviewed, even though objected to by the nonappealing party in the trial court." (5 Cal.Jur.3d, Appellate Review, § 485 at p. 126.) There was no "privity"[8] between the mother and the children; each had separate counsel, and their interests were not at all identical, indeed were largely divergent. There is no reason to depart from the general rule.

VI
(15) The final contention is that there was insufficient evidence to support the decision.
When the modification petitions were filed on November 9, 1977, Fred was 11 years of age and Antoinette 10. They were living with the mother, who had been unemployed since 1972 and was living on three social security disability checks of $329 each. During the eight months following the original dependency adjudication, the mother moved the residence four times. Police officers made two "family disturbance" contacts with her during the same period, both involving herself and one Hardy Jerome Thompson.
*180 The mother had not cooked an evening meal for the children in at least five or six years; they ate primarily at "Smorgy's." She testified that Antoinette "vomits up because she has ulcers."
The children both demonstrated behavioral and emotional problems to a severe degree. It is indicated that neither knows the alphabet. Both had been placed on home instruction programs by their school district. Fred was functioning at a level "between first and second" grades, according to his home program teacher. Neither of the children responded satisfactorily to the teaching efforts of their instructor. The teacher believed they were very much tied to their mother in that she was "very much responsible for the way they behave." The social worker supported the teacher by testimony that the mother appeared to have a need to keep her children close to her at all times and to isolate them from society, so that the children had no "spontaneity" as would children free from "a repressive sort of control."
The social worker encountered difficulty in communicating with the children and felt it was because the mother had influenced them to avoid him. On one occasion in December 1977, she refused to talk with the social worker or to allow the children to talk to him.
In April or May of 1977, the social worker advised the mother to take the children to the Children's Mental Health Services for evaluation. As above noted, she did not do so, but took the children to two private psychiatrists; each of them recommended after examination that they be taken to the Children's Mental Health Services. Defendant rejected this recommendation.
Dr. Griswold believed Fred was suffering from childhood schizophrenia. He described his experience with Antoinette as "a rather amazing repetition of my experience with Fred." He found her to be an emotionally disturbed child. Dr. Garcia testified he "could hardly get any response from them [the children]."
Antoinette had a behavior problem in school, but school officials did not believe it would necessarily help her to go on the home instruction program; however the mother consistently urged that Antoinette be put on the home program, and the district complied. The school principal testified that Antoinette was capable of doing more than she was doing at school and that her constant absences were the problem. He felt that if she had been allowed to stay in school and if she attended more often, *181 she would improve. Her absences were frequently arranged by her mother in advance, and were all "excused absences."
The foregoing constitutes substantial evidence to support the trial court's decision. (In re Robert P., supra, 61 Cal. App.3d at p. 315; In re Melissa H. (1974) 38 Cal. App.3d 173 [113 Cal. Rptr. 139].)
The judgment is reversed as to the dispositional order only. In all other respects it is affirmed. The case is remanded to the trial court with directions to conduct a dispositional hearing.
Puglia, P.J., concurred.
KARLTON, J.[*]
I concur in sections I, II and IV of the majority opinion and that portion of section III-A which recognizes the availability of a motion akin to a demurrer to test the sufficiency of the petition (ante, p. 175). As to the balance of the opinion, I must respectfully dissent.
As the majority recognizes, both the statute and due process require that the petition allege facts. (Welf. & Inst. Code, § 387; In re J.T. (1974) 40 Cal. App.3d 633, 639 [115 Cal. Rptr. 553].) As a practical matter, the petition's allegations provide no meaningful notice of what facts the mother was required to meet at trial. The charging allegations of the petition are an incongruous melange of factual allegations, conclusionary descriptions, opinion and pejorative comment. Thus, the petition does not assert that the mother prevented contact between the placement social worker and the minors (a fact), but rather "meaningful contact" (at best an evaluation of undisclosed facts); in like manner, the petition does not assert that the mother did not obtain mental health counseling for the minors (a fact), but only that she did not obtain "appropriate" mental health counseling (an opinion or pejorative comment); the petition does not allege an unstable environment (perhaps a fact) but an "unstable and inadequate" environment (how the environment could be "unstable" and "adequate" is not suggested); the petition does not assert that the mother failed to cooperate with school officials (a fact) but failed to "adequately" cooperate with school officials (an opinion).[1]
*182 The need for specific factual allegations derives initially from due process considerations. (See In re Ruffalo (1968) 390 U.S. 544 [20 L.Ed.2d 117, 88 S.Ct. 1222]; Cannon v. Commission on Judicial Qualifications (1975) 14 Cal.3d 678, 696 [122 Cal. Rptr. 778, 537 P.2d 898].) Moreover, specificity derives from recognition that "the statutory criterion of improper and ineffective parental care denotes a fairly extreme case. A dominant parental right to custody of the child pervades our law.... Thus before [the law], authorizes the drastic step of judicial intervention, some threshold level of deficiency is demanded. Although a home environment may appear deficient when measured by dominant socioeconomic standards, interposition by the powerful arm of the public authorities may lead to worse alternatives...." (In re Raya (1967) 255 Cal. App.2d 260, 265 [63 Cal. Rptr. 252].)
Nor is the need for specificity an abstract issue of legal niceties as suggested by the majority. A review of the evidence characterized as "substantial" by the majority and used to sustain the trial court's determination cannot be fairly read to be within the charging allegations of the petition. One example will suffice: The petition alleges that the mother failed "to provide appropriate mental health counseling for the minors." The majority notes that the social worker "advised" the mother to take the children to the children's Mental Health Services; instead she "took the children to two private psychiatrists." Why or how the mother's decision relates to the charge is unspecified by the petition (or for that matter the findings or the majority opinion).
The constitutionally deficient pleadings as in this case led, inevitably, to deficient findings. Here, as in In re J.T., supra, "[t]he deficiency in failing to give notice to appellant of the specific factual allegations upon which the deprivation of custody was predicated is further demonstrated by the `findings' made by the court." (40 Cal. App.3d at p. 640.) The majority acknowledges that the findings do not comply with the requirements of rule 1392(d)(1)(a) but asserts such noncompliance results in no prejudice to the mother. I cannot agree.
The rule requires specific factual findings on the matters alleged in the petition. Since the trial court failed to comply with the rule this court "cures" the deficiency by implying the findings. The purpose of factual findings is to make appellate review meaningful (Topanga Assn. for a Scenic Community v. County of Los Angeles (1974) 11 Cal.3d 506, 513-514 [113 Cal. Rptr. 836, 522 P.2d 12]). As the majority opinion's section on substantial evidence demonstrates, in the absence of such findings the reviewing court is set upon a sea of pure speculation.
*183 With a generosity of spirit towards the pleader, regretfully absent in its examination of the mother's plight, the majority acknowledges that "the petition is no model of pleading." The court in In re J.T., supra, 40 Cal. App.3d 633, held that where adequate notice is given by the pleadings, findings standards may be relaxed; however, where conclusionary allegations form the basis of the petition, the code clearly directs that "Such findings, as in the case of civil trials, should state ultimate facts...." (In re J.T., supra, 40 Cal. App.3d at p. 641.) Even under the majority's generous characterization of this petition, this is such a case. The majority's departure from the rule is unexplained.
The court in In re J.T. rested its decision on the operative code sections distinctive use of the words "finding" and "findings" (id., at pp. 640-641). The majority does not address this analysis. The decision in In re J.T. buttressed its statutory construction by reference to a variety of cases where the Supreme Court has required factual findings as a matter of due process. (In re Sturm (1974) 11 Cal.3d 258, 267 [113 Cal. Rptr. 361, 521 P.2d 97]; Topanga Assn. for a Scenic Community v. County of Los Angeles, supra, 11 Cal.3d at pp. 513-514; In re B.G. (1974) 11 Cal.3d 679, 699 [114 Cal. Rptr. 444, 523 P.2d 244].) Again, the majority ignores this analysis. Of course this court is not bound by a decision of a sister appellate court. It appears to me however, that when we part company with another court, we should say why we do so. This the majority has failed to do.
Moreover, in reality, no findings of fact were made in this case. The court merely checked various boxes on a standard form, the boxes, in turn, merely reflected the ultimate result. It may very well be true as the majority suggests that such forms are in use throughout the judicial system of California, that is not the point. Here by statute, rule and case law, specific factual findings were required and not made.
Finally, even if rule 1392(d)(1)(a) and prior case law did not require specific factual findings, I would suggest it is wholly consonant with the gravity of the determination to remove children from their parents that we do so. As the United States Supreme Court has observed "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose ... function and freedom include preparation for obligations the state can neither supply nor hinder." (Prince v. Massachusetts (1944) 321 U.S. 158, 166 [88 L.Ed. 645, 652, 64 S.Ct. 438].) I acknowledge this may well be a case in which that cardinal principle must be subordinated to the equally compelling obligation of the state to *184 intervene in extreme cases; but if so, let us at least justify the decision with clear and unambiguous factual findings.
I also must respectfully dissent from that portion of the opinion holding the mother is without standing to raise the issue of the receipt of the psychiatric testimony. My analysis of the problem does not require an examination of such imponderables, brushed aside by the majority, as what is the meaning of the term "privity" in this context[2] (Clemmer v. Hartford Insurance Co. (1978) 22 Cal.3d 865, 875 [151 Cal. Rptr. 285, 587 P.2d 1098]), or when a case is not "ordinary."[3]
The initial question is not who may assert the psychotherapist-patient privilege at trial, but whether assuming arguendo, that a holder of the privilege objected at trial, may a coparty raise the overruling of the assertion of privilege on appeal.
Resolution of this issue turns on whether, in the language of the California Jurisprudence section relied on by the majority, the error "affects only the appellant's coparties" (5 Cal.Jur.3d, Appellate Review, § 485, p. 126). Thus, if the evidence was admitted only against the children, mother might well have no standing on appeal. Such was not the case here. The evidence was admitted for all purposes and against all parties  both the mother and the children objected  both objections were overruled. Thus we must examine the propriety of the ruling, for if the ruling was incorrect, since the evidence was introduced against her, it directly affects the mother's case and she has standing on appeal.
As has been noted, the court appointed an attorney for the children. The children objected to the receipt of the evidence. Evidence Code section 1014 provides in pertinent part: "the patient ... has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between patient and psychotherapist if the privilege is claimed by: (a) The holder of the privilege; [¶] (b) A person who is authorized to claim the privilege by the holder of the privilege,..." In turn Evidence Code section 1013 provides "As used in this article, `holder *185 of the privilege' means: `(a) The patient when he has no guardian or conservator....'" The previous section 300 proceeding, having deprived the mother of her rights over the children, left them without a guardian or conservator within the meaning of the provisions of section 1013. There was no court order designating anyone as the children's guardian or conservator, these are words of art with specific meaning (Prob. Code, §§ 1400, 1701). Moreover, when the court appointed counsel for the children, he became "a person who is authorized to claim the privilege by the holder." Thus, the court was obligated to honor the assertion of privilege raised by the children's attorney unless there was an effective waiver. The Attorney General asserts the mother waived the privilege by signing releases to the Social Security Administration, the state Department of Health, and indeed the San Joaquin County Department of Public Assistance. However, as the mother properly points out, this occurred after the section 300 proceeding and thus the mother was no longer their guardian for purposes of claiming the privilege, and accordingly she could not waive.
One other consideration as to this issue, suggested but not briefed by the Attorney General, is whether the section 300 hearing placed the power to waive the privilege in the Department of Social Welfare. On our own motion we augmented the record to include the original disposition of the section 300 proceeding. The original order provided that "the D.P.A. is authorized to provide for medical, surgical and dental care for the minors" and that "custody of minors awarded to DEPARTMENT OF PUBLIC ASSISTANCE." Although custody is not equivalent to guardianship, even if by virtue of the court's order, the department somehow became a "holder of the privilege" and thereby empowered to waive the privilege, it does not follow that the waiver is effective. Evidence Code section 912, subdivision (b), specifically provides "[w]here two or more persons are joint holders of a privilege provided by Section ... 1014 (psychotherapist-patient privilege) a waiver of the right of a particular joint holder of the privilege to claim the privilege does not affect the right of another joint holder to claim the privilege...." As I have noted, the previous section 300 hearing placed the children in the custody of the department  no conservator or guardian proceedings were initiated  thus the children were also holders of the privilege and their attorney's assertion of the privilege was effective. Finally, I note, that under the circumstances, the psychiatrists may have been required to assert the privilege. (Evid. Code, § 1015.)[4]
*186 Finally, I must dissent from the majority's determination that there was sufficient evidence to support the judgment. Because I do not believe that there is a record before this court which permits us to determine the basis of the juvenile court's order, I believe we are unable to and should not reach this issue. I recognize the extremely delicate decisions which juvenile courts must make in these kinds of proceedings. Indeed, this case is almost a classic example. On the one hand, we are faced with apparently severely disturbed children whose best interests may well require separation from their mother. On the other hand, we are required to, and should be quite sensitive to our society's primary reliance on the natural relationship between parents and children for the latter's rearing. "The courts have long taken the position that the rights to conceive and raise one's children have been deemed essential, basic civil rights of man and rights far more precious than property." (In re Cynthia K. (1977) 75 Cal. App.3d 81, 84 [141 Cal. Rptr. 875].) While we deal here with disturbed children, we cannot know from this record if the juvenile court found that their illness had anything to do with who had custody. Indeed, much of the evidence which the majority finds substantial, bears at most circumstantially on the issue before the court. Clearly, the mother's repeated moves were due to her lack of finances and cannot be viewed as affecting her right to her children. (I cannot conceive that the majority believes poverty authorizes the state to remove children from their parents.) Moreover, much of the other evidence bears on lifestyle or the mother's inability to get along with social workers and teachers. Does the majority mean to suggest that a mother disagrees with petty bureaucrats and overworked educators at the risk of her children? I wish to stress that I do not find that there is no substantial evidence either. I do believe that in the absence of specific findings, we are without a record to determine the propriety of the trial court's decision. Accordingly, I believe that the entire matter should be returned to the trial court for retrial.
On February 16 and 23, 1979, the opinion was modified to read as printed above.
NOTES
[1] Henceforth section references shall be to the Welfare and Institutions Code unless otherwise indicated.
[2] The petition alleged inter alia "the mother has failed to adhere to the following Juvenile Court Orders of March 18, 1977;

"(a) To provide a stable and adequate environment for the minors.
"(b) To adequately cooperate with school officials.
"(c) To cooperate with the placement social worker in the following areas.
"(1) The mother did not seek or receive approval of the worker in the changes of residences.
"(2) The mother has prevented any meaningful contact between the placement social worker and the minors.
"(d) To provide appropriate mental health counseling for the minors.
"(e) To undergo appropriate mental health counseling in order to understand her effect on the children.
"Further, the minors are unable to experience an appropriate emotional, educational and psychological environment while in the mother's home."
[3] We have sought references to such demurrers in Witkin, California Procedure, Witkin, Summary of California Law; California Juvenile Court Practice (Cont.Ed.Bar 1968, Supp. 1975), 9A California Forms of Pleadings and Practice, Juvenile Courts, 12 California Practice, Infants and Incompetents, 10 California Points and Authorities, Juvenile Courts. None of these recognize the demurrer as a permissible Juvenile pleading. The absence of provisions for responsive pleadings or demurrer may be explained by the very nature of the action; since the issue raised by section 300 proceedings may involve the physical safety of a child, expeditious disposition is to be expected.
[4] We have characterized the motion as "akin to a demurrer," since we do not mean to insinuate the totality of Code of Civil Procedure section 430.10 into the juvenile process. The challenge is available, however, to test the sufficiency of the petition to invoke the jurisdiction of the court.
[5] See the highly germane comments of Justice Mosk in concurrence and dissent. (People v. Hamilton (1969) 71 Cal.2d 176, 183 [77 Cal. Rptr. 785, 454 P.2d 681].)
[6] In part these findings were made by inserting check marks into appropriate boxes on a court form. Although the mother asserts that this results in no findings at all, she offers no authority for such a proposition and we know of none. Such forms are in constant use throughout the judicial system, in both civil and criminal matters. A multitude of them have been approved by the Judicial Council (see list of such forms in Standard Cal. Codes, 1978 edition (Matthew Bender) immediately following rule 1617 of Cal. Rules of Court.)
[7] Rule 1392(d)(1)(a) in pertinent part states: "At the conclusion of the hearing on the supplemental petition, the court shall make findings that: [¶] (a) The factual allegations of the supplemental petition are, or are not, true; and (b) The allegation that the previous disposition has not been effective in the rehabilitation or protection of the minor is, or is not, true."
[8] The word privity has been described as "[a]n elusive term. In general, an identity of interest between persons, so that the interest of the one is measured by the same legal rights as that of the other." Ballentine's Law Dictionary, (3d ed.) Privity has also been described as "[d]erivative interest founded on, or growing out of, contract, connection or bond of union between parties; mutuality of interest." Black's Law Dictionary (4th ed.).
[*] Assigned by the Chairperson of the Judicial Council.
[1] Fairness requires that I recognize that certain factual allegations were made. There is nothing conclusionary about the assertion that the mother did not seek or receive approval of the worker in the changes of residence. Whether such an allegation could possibly support removal of the children from the mother's home is, of course, another matter.
[2] The court in its opinion asserts that there was no privity between the mother and the children. It appears that the counsel for the children may have sought to maintain the children in the mother's home, and in any event both mother and children sought to exclude this evidence.
[3] The law also is said to be "However, when it is necessary to do complete justice, and those portions of the judgment that affect the nonappealing party adversely are woven inextricably with the whole judgment, the reviewing court may reverse the entire cause." (5 Cal.Jur.3d, Appellate Review, § 485, p. 127.)
[4] By the observations I have made concerning waiver of the privilege under the circumstances presented to the trial court, I in no way mean to circumscribe the trial court's power to have a person examined in an appropriate case. (Evid. Code, § 1017.)